**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> **Plaintiff,** <br><br> v. <br><br> CHARLIE RUIZ-RUIZ and SINDIEBELL CRUZ-VALENTIN, <br><br> **Defendants.** | CRIMINAL NO. 22-232 (RAM) |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendants Charlie Ruiz-Ruiz's ("Defendant Ruiz" or "Ruiz") and Sindiebell Cruz-Valentin's ("Defendant Cruz" or "Cruz") (collectively, "Defendants") *Motion to Suppress* and the Government's *Response*. (Docket Nos. 271 and 288, respectively). For the following reasons, Defendants' *Motion to Suppress* is **DENIED**.

## I.   PROCEDURAL BACKGROUND

On May 26, 2022, a grand jury in the District of Puerto Rico returned an *Indictment* charging Defendants[1] with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) & (B) and 846; possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(vi) and 18 U.S.C. § 2; possession

---

[1] Three other defendants were also indicted in this case for conspiracy to possess with intent to distribute controlled substances, as well as other charges according to their individual involvement. (Docket No. 3).

with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii) and 18 U.S.C. § 2; and possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(vii) and 18 U.S.C. § 2. (Docket No. 3). Defendant Ruiz was also charged with maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(2). Id. at 7.

On February 14, 2025, Defendants filed both a *Motion to Dismiss the Indictment*[2] and a *Motion to Suppress*. (Docket Nos. 270 and 271). Defendants move to suppress all evidence obtained from: (1) an executed anticipatory search warrant on their property on February 5, 2021, that allegedly lacked the requisite probable cause and triggering condition at the time of its execution; (2) an allegedly warrantless search of a Porsche Cayenne, with the warrant granted retrospectively on February 8, 2021; and (3) allegedly illegal searches of electronic devices initiated without proper judicial authorization, prior to the digital warrants' issuance on February 23, 2021. (Docket No. 271). The Government filed a *Response* in opposition. (Docket No. 288). Defendants filed a *Reply*. (Docket No. 295). The Government filed a *Sur-Reply*. (Docket No. 298).

---

[2] The Court denied the *Motion to Dismiss the Indictment* on March 12, 2025. (Docket No. 292).

On April 2, 2025, the Defendants also filed a *Motion to Compel Discovery and to Permit Independent Forensic Examination of Seized Electronic Devices* ("*Motion to Compel*"), in which they furthered their argument regarding the Government's alleged forensic analysis of the seized electronic devices prior to the issuance of the warrant of February 23, 2021. (Docket No. 299). The Court denied the *Motion to Compel* on April 14, 2025. (Docket No. 305). Defendants filed a *Motion for Reconsideration* on April 16, 2025 (*see* Docket No. 306), which the Court also denied (*see* Docket No. 326).

On April 21, 2025, Defendants filed a *Motion to File Video Exhibits 1, 2, and 3 in Support of Defendants' Motion to Suppress Evidence* ("*Motion to File Video Exhibits*"). (Docket No. 313). The Court granted this motion on April 23, 2025. (Docket No. 314). Defendants submitted a physical flash drive with three separate video files.[3]

## II.  FACTUAL BACKGROUND

Per the allegations in the *Indictment*, beginning no later than around 2012, Defendants were part of a Drug Trafficking Organization ("DTO") that conspired to possess with intent to distribute controlled substances. (Docket No. 3 at 1-2). The DTO

---

[3] The digital information shall be cited to as "Video Exhibit [X], at XX:XX."

would acquire kilograms of controlled substances from various sources for distribution in Puerto Rico. Id. at 3. Fentanyl was received from Mexico and California by mail, cocaine was received through the mail and by boat from the Dominican Republic, and marijuana was received through the mail from California. Id. The DTO would hire co-conspirators to open mailboxes at United States Post Offices and other private companies in Puerto Rico to receive the parcels. Id. The names addressed on the parcels would often change to avoid detection, and the controlled substances would typically be concealed inside objects or wrapped in other ways to hide their content. Id. Co-conspirators would then send the proceeds from sales through mail or via wire transfers. Id. at 4.

According to other documents and reports, the Department of Homeland Security ("DHS") initiated an investigation into the DTO, with Homeland Security Investigations ("HSI") and Customs and Border Protection ("CBP") intercepting multiple packages containing controlled substances. (See Docket Nos. 271, 274, and 288). Over the course of the investigation, agents conducted surveillance of the DTO and seized sixteen parcels. (Docket No. 288-1 ¶¶ 16-17). Four of those packages were addressed to Urb. Paseo Reales, Calle Atienza #66, San Antonio, Aguadilla, Puerto Rico (the "SUBJECT PREMISES"). Id. ¶ 16.

On February 3, 2021, a fifth parcel was intercepted with the same address as the SUBJECT PREMISES. Id. ¶ 13-14. After executing a warrant and discovering 18.23 pounds of marijuana inside the parcel, HSI agents set up a controlled delivery for the package and sought an anticipatory search warrant for the SUBJECT PREMISES. Id. ¶¶ 19-20. A magistrate judge issued the anticipatory warrant with set triggering conditions on February 3, 2023 ("Anticipatory Warrant"). (Docket No. 288-1).

On February 5, 2021, HSI agents conducted the controlled delivery. (See Docket Nos. 271 and 288). The events surrounding the execution of the Anticipatory Warrant are the subject of the present Motion to Suppress. The timing of searches and the validity of two subsequent warrants are implicated as well: one issued on February 8, 2021, for the search of a Porsche Cayenne ("Porsche Warrant" or "February 8 Warrant") and ones issued February 23 for the forensic analysis search of seized electronic devices ("Electronic Devices Warrants" or "February 23 Warrants"). (See Docket Nos. 288-2 and 288-3).

### III. APPLICABLE LAW

#### A. The Fourth Amendment

The Fourth Amendment to the United States Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. It provides that "no Warrants
shall issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be
searched." U.S. Const. amend. IV. The Fourth Amendment requires
that an "application for an arrest warrant contain sufficient
information to allow the issuing official . . . to 'make a
practical, common-sense decision whether, given all the
circumstances set forth in the [application] before him
. . . there is a fair probability' that a crime has been
committed." United States v. Barbosa, 896 F.3d 60, 67 (1st Cir.
2018) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

　　　"A warrant application must establish 'probable cause to
believe that (1) a crime has been committed – the "commission"
element, and (2) enumerated evidence of the offense will be found
at the place to be searched – the so-called "nexus" element.'"
United States v. Bregu, 948 F.3d 408, 414 (1st Cir. 2020) (quoting
United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)).
Probable cause is a "fluid concept" that is "not readily, or even
usefully, reduced to a neat set of legal rules." Gates, 462 U.S.
at 232. It "requires only a probability or substantial chance of
criminal activity, not an actual showing of such activity." Id. at
243-44. In other words, probable cause "is not a high bar." Kaley
v. United States, 571 U.S. 320, 338 (2014). When determining

whether probable cause exists, courts look at the "totality of the circumstances." Bregu, 948 F.3d at 414 (citing Gates, 462 U.S. at 232). The Government bears the burden of establishing probable cause. *See* United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997) (citations omitted).

The exclusionary rule makes the Fourth Amendment enforceable by prohibiting the fruits of an unreasonable search or seizure from being admitted at trial. *See* United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011); *see also* Wong Sun v. United States, 371 U.S. 471, 484-85 (1963) (discussing the "fruits" of unreasonable searches and seizures). When a defendant moves to suppress evidence under the Fourth Amendment, he has the burden of showing his Fourth Amendment rights were violated. United States v. Rheault, 561 F.3d 55, 58-59 (1st Cir. 2009) (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)).

## B. Standing

As a threshold matter, the person claiming the protection of the Fourth Amendment must demonstrate a legitimate expectation of privacy in the area searched or the item seized. *See* Rakas, 439 U.S. at 143. The burden of establishing this expectation of privacy is often referred to as Fourth Amendment standing, and it is a burden that falls squarely on the defendant. *See* Rawlings v. Kentucky, 448 U.S. 98, 105 (1980); Alderman v. United States, 394

U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."). "[T]he defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993). Until the defendant does so, whether a violation of the Fourth Amendment occurred is not legitimately in issue. *See* United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).

In Aguirre, the First Circuit established a two-tier test to establish the existence of a reasonable expectation of privacy. First, courts must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such." Id. at 857. The following factors are relevant to this inquiry: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Id. at 856–57. If the defendant satisfies this first step, courts must "then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances." Id. at 857.

However, "[n]o single factor determines whether an individual" has an expectation of privacy protected by the Fourth Amendment. Oliver v. United States, 466 U.S. 170, 177 (1984). "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, ownership alone is not dispositive." United States v. Garcia-Robledo, 488 F. Supp. 2d 50, 63 (D.P.R. 2007) (citing United States v. Salvucci, 448 U.S. 83, 91 (1980); Rawlings, 448 U.S. at 105). Courts should also consider "any precautions taken to exclude others or otherwise maintain a privacy interest." Garcia-Robledo, 488 F.Supp. 2d. at 63 (citations omitted).

## C. *Franks v. Delaware*[4]

Generally, applications and affidavits in support of an arrest or search warrant are "presumptively valid." Barbosa, 896 F.3d at 67 (quoting United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013)). However, in certain circumstances, "a defendant may be able 'to rebut this presumption and challenge the veracity' of the warrant application" at a pretrial Franks hearing. Id. (quoting United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015)). There is no right to a Franks hearing. Rather, a defendant "must make a **substantial** preliminary showing that a false statement

---

[4] 438 U.S. 154 (1978).

**knowingly and intentionally, or with reckless disregard for the truth**, was included by the affiant in the warrant affidavit." United States v. Centeno-González, 989 F.3d 36, 50 (1st Cir. 2021) (emphasis added). Then, "for the defendant to be entitled to relief, **the allegedly false statement must be necessary to the finding of probable cause**." Id. (emphasis added).

Material omissions may also serve as the basis for a Franks challenge, but (1) "the omission must have been either intentional or reckless" and (2) "the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause." United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015); see United States v. Castillo, 287 F.3d 21, 25 & n.4 (1st Cir. 2002). However, since "there is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the Franks test." Tanguay, 787 F.3d at 49. Therefore, an omission only triggers the exclusionary rule if it is designed to mislead or is made "in reckless disregard" of whether it would mislead the magistrate in an appraisal of the affidavit. Id. Such recklessness may be inferred directly from an omission "only if 'the omitted information was critical to the probable cause determination.'" Id. (quoting Burke v. Town of Walpole, 405 F.3d 55, 81 (1st Cir. 2005)). Notably, "even negligent

omissions of highly probative information . . . do not satisfy this strict standard." Id.

The First Circuit has "made abundantly clear that, because an application supporting a warrant is presumptively valid, it is incumbent on the defendant to show that he is entitled to a Franks hearing." Centeno-González, 989 F.3d at 50 (internal quotation marks and citation omitted). In the Franks opinion, the Supreme Court explained that "allegations of deliberate falsehood or of reckless disregard for the truth . . . **must be accompanied by an offer of proof.**" Franks, 438 U.S. at 171 (emphasis added). Meaning, a defendant must offer "more than conclusory [allegations] and [they] must be supported by more than a mere desire to cross examine." Id. "**Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.**" Id. (emphasis added). And the allegations "should point out specifically the portion of the warrant affidavit that is claimed to be false . . . and . . . be accompanied by a statement of supporting reasons." Id.

Furthermore, to overcome the presumptive validity of an application supporting a search warrant, Defendants must do more than construct self-serving statements that refute the warrant affidavit. United States v. Andujar-Ortiz, 575 F.Supp. 2d 373, 377 (D.P.R. 2008) (finding that "a Defendant's self[-]serving

statement is not a sufficient offer of proof"); *see* <u>United States
v. McDonald</u>, 723 F.2d 1288, 1294 (7th Cir. 1983). "[F]lat denials
of allegations . . . fall short of the 'substantial preliminary
showing' required to justify a <u>Franks</u> hearing because this only
'set[s] up a swearing contest.'" <u>United States v. Pérez-Greaux</u>, 83
F.4th 1, 33 (1st Cir. 2023) (citation omitted). Thus, a "flat
denial alone 'do[es] not demonstrate a substantial possibility of
affiant perjury.'" <u>Id.</u> (citation omitted); *see also* <u>United States
v. Southard</u>, 700 F.2d 1, 10 (1st Cir. 1983) (holding bare denials
of facts stated in law enforcement affidavits "do not demonstrate
a substantial possibility of affiant perjury" and thus fail to
help defendants meet a "substantial preliminary showing" of
falsehood).

### D. The Exclusionary Rule & Good Faith Exception

The Court must also "determine whether the fruits of that
Fourth Amendment violation ought to be suppressed." <u>United States
v. Mata-Pena</u>, 233 F.Supp. 3d 281, 293 (D.P.R. 2017). "The
exclusionary rule has traditionally barred from trial physical,
tangible materials obtained either during or as a direct result of
an unlawful invasion." <u>Wong Sun</u>, 371 U.S. at 485. However, the
"exclusion of evidence does not automatically follow from the fact
that a Fourth Amendment violation occurred." <u>Davis v. United
States</u>, 564 U.S. 229, 244 (2011) (citations omitted). Rather, the

exclusionary rule applies only where its purpose, namely to "deter future Fourth Amendment violations[,]" is "effectively advanced." Id. at 236-237, 244.

To trigger the exclusionary rule, the police conduct at issue must be sufficiently deliberate, reckless, grossly negligent or consist of a recurring or systemic negligence, so that the deterrence achieved by suppressing evidence is worth the price paid by the justice system. *See* Herring v. United States, 555 U.S. 135, 144 (2009). On the contrary, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way[.]" Davis, 564 U.S. at 238 (internal quotations and citations omitted).

Accordingly, "[e]ven if a warrant issues upon an insufficient showing of probable cause, suppression may be inappropriate if the officers involved have exhibited objective good faith." United States v. Floyd, 740 F.3d 22, 32 (1st Cir. 2014). Still, "recklessness can defeat a claim of good faith." United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017). This line is crossed "when an affiant 'in fact entertained serious doubts as to the truth' of his statements or when 'circumstances evincing obvious reasons to doubt the veracity of the allegations' were present."

Id. at 447 (quoting United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002)). "In contrast, small inaccuracies in a warrant affidavit do not invalidate the warrant if those inaccuracies result from good-faith mistakes." Id. (noting "incorrect assertions made in good faith reliance on a third party's errors, or even lies, do not demand suppression," nor do "sincere reliance on incorrect technical data, even when law enforcement officers themselves are to blame for the bevue").

## IV. DISCUSSION

### A. The Anticipatory Search Warrant Issued February 3, 2021, for the SUBJECT PREMISES was Supported by Sufficient Probable Cause and Executed According to the Triggering Conditions[5]

Defendants assert that the Anticipatory Warrant was not supported by the requisite probable cause at the time of its execution "because the specified triggering event – the controlled receipt of the suspect package – did not occur as mandated, rendering the subsequent searches unconstitutional." (Docket No. 271 at 1, 3).

An anticipatory warrant is "based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." United

---

[5] As a threshold matter, Defendants have established standing to challenge the searches conducted on their property (Docket No. 271 at 2-3), and neither the Court nor the Government dispute this (Docket No. 288 at 7-8).

States v. Grubbs, 547 U.S. 90, 94 (2006). Most anticipatory warrants subject their execution to a "[triggering] condition precedent other than the mere passage of time." Id. For a conditioned anticipatory warrant to comply with the Fourth Amendment's probable cause requirement, two prerequisites of probability must be satisfied: (1) "[i]t must be true not only that *if* the triggering condition occurs there is a fair probability that contraband or evidence of a crime will be found in a particular place," but (2) that there is also "probable cause to believe the triggering condition *will* occur." Id. at 96-97 (internal citations and quotation marks omitted).

Any supporting affidavit must provide sufficient information for a neutral magistrate to evaluate both aspects of the probable-cause determination. Id. at 96. "Grubbs rejected the notion that an anticipatory warrant must delineate the triggering condition on its face, holding that the Fourth Amendment's particularity requirement does not require warrants to include a specification of the precise manner in which they are to be executed." Bregu, 948 F.3d at 417 (quotation marks omitted).

All warrants at issue in this case were supported by sworn affidavits from Special Agent Giovanni González ("Agent González") of the Department of Homeland Security, Homeland Security

Investigations ("DHS/HSI"). (*See* Docket Nos. 288-1, 288-2 and 288-3).

> i.  *Defendants fail to make the substantial showing required for a* <u>Franks</u> *hearing regarding the Anticipatory Warrant*

Defendants begin by alleging that all the supporting affidavits for the issued warrants (a) "lacked specific, reliable evidence" linking Defendants to the alleged drug trafficking activities; and (b) contained material omissions and misrepresentations that misled the issuing magistrate judges. (Docket No. 271 at 24, 38-41).

First, Defendants claim that the Anticipatory Warrant affidavit "falsely asserted that the package in question was being delivered to and intended for Charlie Ruiz-Ruiz and Sindiebell Cruz-Valentin." Yet this is in direct contradiction with the warrant affidavit. (*See* Docket No. 288-1). The warrant identifies that the address for the SUBJECT PREMISES is the residence of Ruiz and Cruz, yet it makes no mention that the package was intended for either of those inhabitants directly. (Docket No. 281-1 ¶ 15). In fact, the affidavit goes further to emphasize that they are not sure who will claim the package providing that "[a] this time, law enforcement does not know who or how many people will be claiming the parcel." (Docket No. 288-1 ¶ 21).

Defendants also contend that the "affidavit misrepresented the necessity of immediate action" by suggesting Defendants were engaged in ongoing drug trafficking operations, "when in reality, the government had no direct evidence linking them to any prior or current drug-related activity." (Docket No. 271 at 39). Defendants argue the Government's allegations were uncorroborated, speculative, and false, since Defendants "never attempted to open that package in their home and removed the unopened package from the residence to return it to the post office." (Docket No. 271 at 39). However, **the affidavit never specified that Defendants would be the individuals receiving and opening the parcel**, and the portrayal of Ruiz as a civic-minded citizen is self-serving commentary presented by defense counsel that is uncorroborated by sworn testimony.

Additionally, Defendants argue the Government failed to disclose that law enforcement had not previously conducted a controlled delivery "to confirm whether the Defendants would actually accept, claim, or exercise control over the package." (Docket No. 271 at 39). Further, Defendants assert most of the federal documents allege Cruz was the package recipient, when in fact the recipients were others. (Docket No. 271 at 41).

As the Government points out, details in the separate government reports are not relevant to the magistrate judges'

findings of probable cause because the appended materials were not considered when deciding to issue the different warrants. (Docket No. 288 at 6-7). The Court also notes that Defendants' telling of events in both the *Motion to Suppress* and *Reply* frequently contradicts facts provided in their appendices, specifically the different DHS reports' details of whether controlled deliveries were attempted,[6] if surveillance was conducted,[7] and whether Cruz was ever notified of package interceptions.[8] (*See* Docket No. 274 at 16-187).

---

[6] The DHS Incident Report for a cocaine seizure dated 2/20/2020 stated that "a controlled delivery was attempted with negative results." (Docket No. 274 at 23-23). The DHS Reports for cocaine seizures dated 2/22/2020 and 5/8/2020 stated "pending a possible controlled delivery" and "possible controlled delivery." Id. at 34, 58. And the DHS Report from a fentanyl seizure on 9/11/2020 noted "do not notify for 30 days, pending controlled delivery on 8/4/2020." Id. at 90. Notably, the DHS Report for the marijuana seizure dated 2/3/2021 for the package that became the subject of the controlled delivery at issue in relation to the Anticipatory Warrant stated that a possible controlled delivery would occur. Id. at 183-84.

[7] The DHS Incident Report for the marijuana seizure dated 9/18/2020 detailed surveillance conducted by agents on September 14 and 15, 2020. (Docket No. 274 at 122-23). A dog had alerted to a package containing 19.54lbs of marijuana and addressed to Cintya Valentine (alias of Cruz) at the Pack Company in Aguadilla. Id. On September 14, no one showed up. On September 15 at 12:30, Ivelisse Alvarez-Sepulveda arrived, found no parking and departed. Id. At 1pm, Alvarez-Sepulveda arrived at the Pack Company parking lot in the same vehicle, accompanied by Ruiz and a female minor. Id. Ruiz was the driver, and he remained in the vehicle while Alvarez-Sepulveda and the minor went inside, then exited without any packages. Id. Agents followed the vehicle towards the road leading to the stash house and ended surveillance at 1:21pm. Id.

[8] The DHS Incident Report for a fentanyl seizure dated 8/5/2020, notes that a letter was sent informing Cruz of the property seized. (Docket No. 274 at 77). In this case the intercepted package contained fentanyl pills inside a vehicle fuel injection module. Id. at 62-84.

"Because there is a presumption of validity with respect to the affidavit supporting the search warrant, such a showing must consist of more than a mere conclusory statement that the affidavit is false." United States v. Cortez, 108 F.4th 1, 11 (1st Cir. 2024) (cleaned up). The Court finds that Defendant has failed to make a substantial preliminary showing that Agent González knowingly and intentionally, or with reckless disregard for the truth, included a false statement in his affidavit or made a material omission of critical fact. See Centeno-González, 989 F.3d at 50. Consequently, Defendants' request for a Franks hearing must be denied for these reasons, as well as the explanation below addressing the triggering conditions of the Anticipatory Warrant.

   ii.  *Probable cause existed for issuing the Anticipatory Warrant*

   Defendants contend the Anticipatory Warrant lacked probable cause and an evidentiary nexus between the alleged narcotics shipment and Defendants, rendering the warrant facially invalid. (Docket No. 271 at 25-26). Defendants maintain that the "only basis" for the Anticipatory Warrant was that packages containing controlled substances had previously been delivered to their residence, the SUBJECT PREMISES Id. at 25. They argue that the Government "failed to provide reliable evidence" that either Ruiz or Cruz was "aware of, or involved in, the shipment of narcotics,"

or that they "had any knowledge of, or control over, the intercepted packages." Id.; (see also Docket No. 295 at 2-4, 6-7). Defendants argue the Government's failure to conduct any prior controlled deliveries undermines its entire argument, and that the warrant affidavit contained no evidence showing Defendants had previously claimed or retrieved any of the packages allegedly linked to the drug trafficking. (Docket No. 271 at 25-26).

Yet, the warrant affidavit lays out the HSI investigation into the DTO that is actively smuggling contraband into Puerto Rico via the U.S. Postal Service, private delivery services, and privately owned vessels. (Docket No. 288-1 ¶ 12). HSI agents corroborated that the DTO's use of a small apartment complex and residence in Aguadilla as a stash house for controlled substances and drug proceeds. Id. Throughout the investigation, sixteen parcels had been seized containing fentanyl, marijuana, and cocaine. Id. ¶ 16. **Notably for the purposes of the Anticipatory Warrant, four of those parcels were addressed to the SUBJECT PREMISES.** Id. The affidavit also noted that "[t]hrough surveillance, agents have confirmed that member[s] of this DTO have received parcels that bear similar characteristics to the parcels seized during this investigation." Id. ¶ 17.

The package intercepted on February 3, 2021, and the subject of the controlled delivery in the Anticipatory Warrant, was also

addressed to the SUBJECT PREMISES. Id. ¶¶ 13-14. Inside the
package, agents had discovered 18.23 pounds of marijuana. Id. ¶ 18.
HSI agents intended to use this package to conduct a controlled
delivery at the SUBJECT PREMISES of the Anticipatory Warrant.
Id. 20-21.

"[P]robable cause does not demand certainty, or proof beyond
a reasonable doubt, or even proof by a preponderance of the
evidence – it demands only a 'fair probability that contraband or
evidence of a crime will be found in a particular place.'" United
States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016). Accordingly, if
the triggering condition was met, the Anticipatory Warrant was
supported by sufficient probable cause.

### iii. *The satisfied triggering condition provided probable cause for proper execution of the Anticipatory Warrant*

Defendants allege the Government executed the Anticipatory
Warrant prematurely, thus eliminating probable cause for the
search of the residence. (Docket No. 271 at 29-31). Factually,
Defendants assert that the attempted controlled delivery of the
package at their residence went as follows:

- Ruiz was not at home at the time of the controlled
  delivery.

- **Ruiz's 13-year-old daughter**[9] **initially received the package from the postal inspector** acting under the direction of HSI.

- **"Upon the daughter taking possession of the package," Cruz intervened and took the package from her**, and then placed it in the garage "without opening or tampering with it."

- Ruiz returned later that day, "learned about the package, and decided to return it to the post office without opening it."

- Ruiz placed the package in the trunk of his Porsche and left the residence "with the intention of returning it to the sender."

- At that moment, law enforcement "intervened and initiated an aggressive, military-style stop" of Ruiz's car "using over 25 armed federal agents and tactical equipment, including a military-grade tank."

---

[9] In defense counsel's various iterations of this story, he first comments that the minor daughter is aged thirteen (*see* Docket No. 271 at 12, 30), yet this changed to the age of fifteen (*see* <u>id.</u> at 40). Defendants' *Reply* refers to the daughter as thirteen years of age. (Docket No. 295 at 4, 9). In the *Motion to File Video Exhibits,* the minor child is described as Cruz's "then-14-year-old daughter." (Docket No. 313 at 2).

- Agents removed Ruiz from the car, restrained him, and searched the car "without a separate warrant, seizing the unopened package from the trunk."

- "Immediately after this seizure, law enforcement proceeded to execute the anticipatory warrant on the residence."

(Docket No. 271 at 30). According to Defendants, all of this happened "despite the fact that the triggering event, such as formal acceptance, had never occurred as required by the terms of the warrant." Id. Since "probable cause was entirely dependent on the package being accepted and opened by one of the Defendants," and neither Ruiz nor Cruz "opened, accepted, or attempted to tamper with the package, probable cause never materialized." (Docket No. 271 at 31). As such, they contend that law enforcement "knew or should have known that the triggering event had not occurred." Id.

Throughout the *Motion to Suppress*, Defendants make differing claims about what constitutes the triggering condition for the Anticipatory Warrant.[10] Therefore, as an initial point of order,

---

[10] This goes as far as saying that "law enforcement proceeded to execute the search warrant without confirming if the terms – specifically, the personal acceptance of the parcel by Mr. Ruiz-Ruiz – had been fully satisfied." (Docket No. 271 at 13; *see also* Docket No. 271 at 45 (stating "the triggering condition required that the package containing suspected narcotics be delivered, accepted, and either opened, tampered with, or left unattended for a significant period before law enforcement could conduct the search")).

the Court will look to the exact terms approved by the magistrate
judge in issuing the warrant.

Magistrate Judge Lopez issued the anticipatory search and
seizure warrant on February 3, 2021, stating that **probable cause
could be established upon the occurrence of one of the three
following conditions** proffered in the affidavit supporting the
warrant. (Docket No. 288 at 26). The affidavit specified that any
of these events "can independently or in conjunction trigger the
execution of the search warrant and its provisions":

> a. HSI Agents conduct a controlled delivery of the
> **PACKAGE** to the residence in the above stated address,
> where an individual identifies himself or herself as the
> package recipient.
>
> b. Any indication the **PACKAGE** has been opened or the
> contents have, are, or will be removed.
>
> d. Any indication that the recipient(s) of the **PACKAGE**
> have, are, or will attempt to destroy the contents of
> the **PACKAGE.**

Id. at 37.

As the Government notes, the triggering event in Paragraph
12(a) of the affidavit supporting the warrant does not state that
the recipient of the package for the controlled delivery must be
one of the Defendants. (*See* Docket No. 288 at 12-15). Rather, the
subject of the warrant is the residence, and any individual
identifying himself or herself as the package recipient suffices
to trigger probable cause.

The *Motion to Suppress* argues that Defendants' minor daughter initially received the controlled delivery package from an undercover HSI agent (*see* Docket No. 271 at 12, 30, 40), contradicting Government reports that Cruz accepted the parcel and verbally acknowledged its addressee (*see* Docket No. 274 at 202 and 257). **Notably, Defendants initially failed to present video evidence[11] or a sworn affidavit to corroborate their version of the events. Instead, Defendants provided various documents in their appendices that support the Government's position.[12]**

First, a DHS report describes footage from a Night Owl DVR Recorder on February 5, 2021, around 1:58p.m., where the "package was accepted by Sindiebell CRUZ-Valentin." (Docket No. 274 at 202). Second, this account is reiterated in the affidavit supporting the Porsche Warrant and the Electronic Devices Warrants, where Agent González gives a synopsis of the controlled delivery. This account states that Cruz accepted the package after the undercover agent made "her aware that the package was addressed to a person named Estela MENDOZA[,] which CRUZ-VALENTIN verbally acknowledged and

---

[11] The Court notes that Defendants ultimately submitted videos on April 21, 2025, over two months after they filed their *Motion to Suppress*. (*See* Docket No. 313). The Court will address the video evidence further below.

[12] Defendants do not include the report for the execution of the Anticipatory Warrant in the assortment of documents appended to their *Motion to Suppress*.

took possession of the **PACKAGE**." <u>Id.</u> at 257; (Docket No. 288-3 ¶ 19).

As determined above, if Defendants wish to challenge the establishment of probable cause for the Anticipatory Warrant, they must produce more than self-serving factual allegations in the body of a *Motion to Suppress* as the basis for their contentions. Defendants provide no sworn testimony to challenge this set of events, nor produced the video they contend tells the proper story when filing their *Motion to Suppress*. However, Defendants specifically state:

> Video footage taken during the controlled delivery **clearly shows that Mrs. Cruz-Valentín did not personally accept the parcel from the undercover agent. Instead, her 15-year-old daughter initially retrieved the package, and Cruz-Valentín took it from her daughter without ever directly interacting with the undercover agent**. The footage further confirms that Cruz-Valentín never looked at the package, much less its address, before taking it inside. At no point did she verbally acknowledge the name "Estela Mendoza," nor did she sign for or otherwise confirm receipt of the package. The claim that she was made aware of the addressee before accepting the package is completely unfounded and contradicted by objective video evidence.

(Docket No. 271 at 40). But "flat denials of allegations . . . fall short of the 'substantial preliminary showing' required to justify a <u>Franks</u> hearing because this only 'set[s] up a swearing contest.'" <u>Pérez-Greaux</u>, 83 F.4th at 33 (citation omitted). Furthermore, the

*Motion to Suppress* itself states different versions of the interaction between the daughter and the undercover agent. Phrasings differ from stating the daughter received the package, took possession of it, or received it – to limiting the encounter to she "began to accept" the package. *See* id. at 12, 30, 40. Ultimately, the Defendants' contention seems to be neither the daughter nor Cruz verbally acknowledge herself as the recipient, and that Cruz grabbed the parcel from her daughter without any interaction with the undercover agent. *See* id. at 12-13.

In their *Reply*, Defendants go on to say the "only reason the package entered the home was that the undercover agent deliberately handed it to a minor and then left the scene, avoiding any opportunity for an adult resident to reject the delivery" in "entrapment-like conduct." (Docket No. 295 at 11). Defendants describe that the video evidence **will show**:

> 1. The undercover agent delivers the package without asking any questions or confirming whether the recipient was present. **The agent hands the package directly to the 13-year-old minor** without any effort to verify lawful acceptance.
>
> 2. [Cruz] **removes the package from her daughter's hands** without looking at the mailing slip or confirming the intended recipient.
>
> 3. [Cruz] immediately calls Ruiz-Ruiz to inform him that an unknown package was mistakenly delivered to their home. . .

(Docket No. 295 at 4-5, 8-11). However, **there is no sworn affidavit to corroborate this account**. Moreover, the Defendants misconstrue the Government's account by saying it "falsely claims that [Ruiz] knowingly accepted the package." (Docket No. 295 at 11). This is never stated, nor does the Government insist acceptance by Ruiz alone is the triggering condition.

With each filing, defense counsel adjusts the narrative with details to bolster the quest for a <u>Franks</u> hearing, **yet at no point does defense counsel include an offer of proof to support such accounts and contradict the Government's affidavits and reports**. After more than two months of continuing the narrative that Defendants' minor daughter first accepted and possessed the package, Defendants submit video evidence that **directly contradicts this assertion**.

In filing their *Motion to File Video Exhibits,* Defendants assert that since "the video evidence provides real-time, factual documentation, Defendants have not submitted sworn affidavits" from Cruz or Ruiz. (Docket No. 313 at 2). They further state that the "Supreme Court has held that where video evidence 'blatantly contradicts' a party's narrative, the version shown on video must control." <u>Id.</u> (citing <u>Scott v. Harris</u>, 550 U.S. 372, 378-81 (2007)). However, it is Defendants' narrative of events that the

video evidence "blatantly contradicts." The video labeled "2021-02-05 CD-Aguadilla" ("Video Exhibit 1") shows the interaction between the undercover HSI agent, Cruz, and her minor daughter during the controlled delivery. (Video Exhibit 1 at 0:00-1:02). **Crucially, Defendants' minor daughter never touches the package.** At 0:19, the daughter appears in the video and walks into the front yard of the SUBJECT PREMISES, halfway between the house and the delivery truck. However, when the delivery man starts walking the package towards the house, Cruz struts out at 0:32 and takes the package directly from the undercover agent's hands. The daughter is standing to the side and never reaches for the package, let alone possesses it as Defendants allege in the *Motion to Suppress*.

In the *Motion to File Video Exhibits*, Defendants argue that Video Exhibit 1 "shows that no verbal communication occurred between federal agents and either [Cruz] or her then-14-year-old daughter during the delivery." (Docket No. 313 at 1-2). Thus, they contend the video contradicts the Government's claim that Cruz "was advised that the package was not addressed to her and that she verbally acknowledged its receipt." Id. However, the video evidence presented contains no audio to support this contention. (*See* Video Exhibit 1). Moreover, it fails to blatantly contradict the Government's account of the controlled delivery as detailed in the sworn affidavits for the Porsche Cayenne and electronic devices

warrants. **Defendants claim they do not need to provide sworn affidavits from Ruiz or Cruz — stating they are not necessary given the video evidence presenting "real-time, factual documentation" — even though the video contradicts the *Motion to Suppress* narrative**. (Docket No. 313 at 2).

Accordingly, the Court finds the triggering condition was met, probable cause established, and the search of the SUBJECT PREMISES was executed upon a valid warrant. Defendants have not presented an offer of proof entitling them to a <u>Franks</u> hearing.

### iv. *Criminal liability in mail package cases is not applicable*

Defendants also make an argument under the theory of criminal liability in mail package cases, asserting that a "package merely being sent to an address does not automatically make the resident liable for its contents" or establish criminal liability. (Docket No. 271 at 20, 36). Accordingly, Defendants aver they cannot be found guilty of possession of narcotics "merely because a package containing contraband was delivered to their address." <u>Id.</u> at 18-21, 36-38. Furthermore, Defendants contend the Government cannot establish constructive or actual possession over the packages since it failed to conduct a controlled delivery. <u>Id.</u> 36-38. And since Defendants "never requested, accepted, opened, or exercised control" over the narcotics-laden packages, "there is no legal

basis to sustain the charges of possession with intent to distribute controlled substances." Id.

Defendants overlook a key matter. **The issuance of the warrant is a matter of probable cause, not conviction, and establishing criminal liability is a different standard of proof**. The majority of cases cited by Defendants, in addition to being mostly out-of-Circuit, reference criminal liability in mail package cases as the bar needed to sustain a **conviction**. This is not the same as the standard of proof needed to establish probable cause for issuance of a **search warrant**.

Furthermore, as noted above, the Anticipatory Warrant was for the SUBJECT PREMISES, and thus was not a matter of pinning criminal liability to Defendants at that moment. The affidavit made it clear that agents were unsure at the time who would be receiving the package upon its controlled delivery, and the triggering conditions were based on factors that did not require Defendants themselves for executing the search. While Defendants point to them not being arrested until a later date as proof of the Government's lack probable cause to search the SUBJECT PREMISES (Docket No. 271 at 43), it is more indicative of them **not** being arrested for merely possessing a package containing contraband. Instead, utilizing the legally obtained evidence, agents assembled the case to later indict Defendants.

In their *Reply*, Defendants contend that the Government failed to adhere to Federal Mail Regulations by: (1) failing to confirm the identity of the package recipient and instead deliberately handing the package to a minor who was not authorized to accept delivery, in violation of 39 U.S.C. § 3004; (2) manipulating delivery to deprive Defendants of the opportunity to refuse acceptance, obstructing correspondence in violation of 18 U.S.C. § 1702; and (3) failing to adhere to procedural safeguards of Fed. R. Civ. P. 4(f). (Docket No. 295 at 5-6). Accordingly, since these guidelines were not followed and Defendants "never signed for or acknowledged receipt of the package," the controlled delivery was never legally completed – negating the triggering condition and causing the search warrant to be prematurely executed. Id. at 6.

In its *Sur-Reply*, the Government dismisses these allegations as irrelevant. (Docket No. 298 at 3-4). First, the Government notes that the controlled-delivery package was a UPS package, not a USPS package, so 39 U.S.C. § 3004 does not apply. Id. Second, the Government asserts Defendants' citation to 18 U.S.C. § 1702 is also misplaced because "the package was redirected pursuant to a court-authorized controlled-delivery operation." Id. Third, Fed. R. Civ. P. 4(f) governs service of process and is not applicable here. For the following reasons, the Court rejects Defendants' arguments regarding Federal Mail Regulations.

B. **The Stop, Seizure, and Search of the Porsche Cayenne was Supported by Sufficient Probable Cause and the Issuance of a Valid Warrant on February 8, 2021[13]**

    i. *Defendant Ruiz has standing to challenge the February 5 stop of the Porsche Cayenne, but Defendants failed to establish standing to challenge any subsequent search of the vehicle*

As a preliminary matter, the Government contests Defendants' standing to legally challenge the search of the Porsche Cayenne since the *Motion to Suppress* contains no information that allows an objective analysis of Defendant Ruiz's subjective expectation of privacy.[14] (Docket 288 at 7-10). The Government argues that Ruiz fails to prove ownership since he provided no registration or other proof that it was his car, and he "expressly denies ownership of the package found within the Porsche." Id. at 9. Further, Defendant failed to allege "facts supporting his historical use, possession, or control of either the car or the items seized from it." Id. at 9-10.

---

[13] Defense counsel conflates what he alleges as a "warrantless search" with the date of the February 8 executed warrant on the Porsche Cayenne. (*See* Docket No. 271 at 26-27, 32-35, 46). The "warrantless search of February 8" seems to suggest the stopping of the vehicle on February 5, 2021. *See* id. The Court will address both the stop and seizure of the Porsche Cayenne on February 5, 2021, and the search conducted on February 8, 2021, pursuant to the executed Porsche Warrant.

[14] The Government contends Cruz failed to establish standing to challenge either the search or seizure of the Porsche. (Docket No. 288 at 8). However, it notes that Ruiz "may have standing to challenge the initial seizure, but has not established standing to challenge the ensuing search." Id.

In the *Motion to Suppress*, Defendants allege that Ruiz has standing to challenge the warrantless search and seizure of his Porsche Cayenne and property within it "because he was the registered owner and lawful possessor of the vehicle." (Docket No. 271 at 23). However, they note that the Supreme Court has held that individuals lawfully in possession of a vehicle have standing to challenge its search "even if they are not the registered owner." Id. (citing Byrd v. United States, 138 S. Ct. 1518 (2018)).

"The search and seizure of a vehicle are discrete acts with separate standing requirements." United States v. Villa-Guillén, 414 F.Supp. 3d 248, 249 (D.P.R. 2019); *see* United States v. Odoni, 782 F.3d 1226, 1237 (11th Cir. 2015) ("Searches and seizures implicate two distinct interests; a privacy interest affected by a search, and a possessory interest affected by a seizure"). "When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment." Brendlin v. California, 551 U.S. 249, 251 (2007).

The Supreme Court has recognized that even passengers have Fourth Amendment rights in the context of vehicle stops. *See* id. at 263; *see also* Arizona v. Johnson, 555 U.S. 323 (2009) (explaining that a passenger "is seized, just as the driver is, from the moment [a car stopped by law enforcement comes] to a halt on the side of the road"). However, this does "not extend Fourth

Amendment rights to passengers who challenge only the search of the vehicle in which they are traveling and not their seizure." United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012). In United States v. Starks, the First Circuit found that the status of an "unlicensed, unauthorized driver" was still no less than that of a passenger. 769 F.3d 83, 89 (1st Cir. 2014). Accordingly, the Court finds that Defendant Ruiz has standing to challenge the traffic stop of the Porsche Cayenne on February 5, 2021.

As to standing to challenge the search of the vehicle, the Court assesses Defendant Ruiz's "reasonable expectation of privacy in the area searched and in relation to the items seized." Aguirre, 839 F.2d at 856. This threshold inquiry looks to several factors: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Id. at 856-57. Essentially, the Court must determine (1) "whether or not the individual thought of the place (or the article) as a private one, and treated it as such," and then (2) "whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances." Id. at 857.

Defendants have had ample opportunity to evince they enjoy the requisite standing to challenge the search of the car, "but nothing [has] materialized." *See* id. at 857. There is no evidence that Ruiz owned or leased the Porsche, or that it was registered to him. In fact, within the appendices provided by Defendants, the affidavit for the Porsche Warrant states that a "record check of the SUBJECT VEHICLE revealed that is registered to an individual named Juan Manuel LOPEZ-Rosario." (Docket No. 274 at 253). While there is evidence Ruiz possessed the keys and had the ability to regulate access to the vehicle since he was actively driving it at the time of the stop, there is no sworn statement corroborating a history of use or explaining why Ruiz has access or permission to use a vehicle that is registered to another individual.

"In the context of a vehicle search, a defendant must show 'a property [or] a possessory interest in the automobile' in order to establish a reasonable expectation of privacy." United States v. Almeida, 748 F.3d 41, 47 (1st Cir. 2014). Defendants fail to provide an offer of proof supporting their assertions, such as registration or other indicia that Ruiz lawfully possessed and owned the Porsche Cayenne. Thus, it is difficult to assess whether Defendant Ruiz had an objective reasonableness in expecting privacy given the facts of the case.

"[I]n some circumstances, a person who borrows a vehicle with the owner's permission may have a reasonable expectation of privacy." Id. While Ruiz may subjectively have believed he had an expectation of privacy in a borrowed car, there is no objective reasonableness to this belief without further information explaining how Ruiz came into possession of and utilized the Porsche Cayenne at issue. *See* United States v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982) (holding defendant driving the vehicle when it was stopped "failed to meet his burden of proof of a privacy expectation" because he "did not own the car, nor was there evidence that he had used the car on other occasions"). Accordingly, the Court finds that Defendants lack standing to challenge either the alleged February 5 search of the Porsche Cayenne or the February 8 search. *See* Symonevich, 688 F.3d at 19 (noting "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his [or her] Fourth Amendment rights infringed" (quoting Rakas, 439 U.S. at 134)).

Although the Court finds that Defendants lack standing to challenge the search of the Porsche Cayenne, it will nonetheless analyze the substantive issues on the merits as well.

> ii.  *The stop and seizure of the Porsche Cayenne on February 5, 2021, was lawful*

Defendants contend that after law enforcement unlawfully searched the SUBJECT PREMISES on February 5, 2021, they conducted an "aggressive warrantless" stop, seizure, and search of the Porsche Cayenne. (Docket No. 271 at 13-14, 26-27, 32-35, 46). This meant forcibly removing Ruiz from his vehicle, conducting a full search of the Porsche Cayenne, including the trunk, and seizing the unopened package along with other items from the vehicle before impounding it "without a valid legal basis." Id. at 13, 33.

Defendants contend there was no valid search warrant and no warrantless search exceptions apply since: (1) Ruiz was not under arrest, (2) there was no independent probable cause to believe the vehicle contained evidence of a crime or contraband, and (3) there were no exigent circumstances to justify a warrantless search. (Docket Nos. 271 at 26, 32-33, 46 and 295 at 12-14, 19-20). Thus, the only connection to alleged drug trafficking activity was that Ruiz placed the unopened package inside his car with the intent of returning it to the post office, rather than possessing or distributing its contents. (Docket No. 271 at 26-27).

In *Response*, the Government contends that law enforcement properly seized the Porsche "as it was leaving the scene of the successful controlled delivery," thus they had probable cause to

believe the car contained articles that the officers were entitled to seize. (Docket No. 288 at 16-17 ("Agents knew the package was in the Porsche.")). Furthermore, the Government points to caselaw supporting the premise that a "seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Id. at 17 (quoting Payton v. New York, 445 U.S. 573, 587 (1980) and citing United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015)). Thus, automobiles may be searched without a warrant provided there is "probable cause to believe that the car contains articles that the officers are entitled to seize." Id. at 15 (quoting Chambers v. Maroney, 399 U.S. 42, 48 (1979)).

Defendants argue that the plain view doctrine does not apply since law enforcement "was not lawfully in the viewing area at the time of the search," nor did they have right of access to the package. (Docket No. 295 at 12-14). Further, they state that observation of the package inside the Porsche cannot justify the warrantless intrusion because the "incriminating nature of the package was not immediately apparent."[15] Id.

---

[15] Defendants also state that the automobile exception does not apply since law enforcement lacked probable cause at the time of the warrantless search and the Government's "affidavit fails to articulate any facts showing that officers has reason to believe that the vehicle contained contraband when it was searched." Id. at 19-20.

In Illinois v. Andres, the Supreme Court held that "[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal." 463 U.S. 756, 771 (1983). Here, the controlled delivery package had been opened pursuant to a valid search warrant, and the "simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights." Id. at 771-772 (finding "once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost"). While the controlled substances were removed from the package before the container was sealed for the attempted controlled delivery, that does not affect this assessment. Further, Defendants reiterate that the package is not theirs – so they have no privacy interest in the parcel itself.

If there are large gaps in surveillance, it is possible a container could be put to other uses, but the "likelihood that this will happen depends on all the facts and circumstances, including the nature and uses of the container, the length of the break in surveillance, and the setting in which the events occur." Id. at 772. Here, the time between when Cruz accepted the package during the controlled delivery and when Ruiz backed the Porsche

out of the garage with the package was roughly thirteen minutes. *See* id. at 773 (holding "absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority"). The controlled delivery package had contained *known* contraband which the Government identified pursuant to a valid warrant before extracting the controlled substances to arrange a controlled delivery. Accordingly, the incriminating nature of the package was immediately apparent to law enforcement.

Under the "plain view doctrine," a warrantless seizure is lawful if the following three elements are met: "(i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure of that object; and (iii) he has a right of access to the object itself." United States v. Sanchez, 612 F.3d 1, 4-5 (1st Cir. 2010) (citing United States v. Allen, 573 F.3d 42, 51 (1st Cir. 2009); United States v. Antrim, 389 F.3d 276, 283 (1st Cir. 2004)). When "a seizure of items in plain view is supported by probable cause, an inquiring court will not look behind that justification." Sanchez, 612 F.3d at 6. The affidavit in support of the Porsche Warrant states that as Ruiz "was exiting the garage driveway area, while driving the SUBEJCT VEHICLE, he was intercepted by HSI agents. The PACKAGE was observed in plain

view in the rear of the SUBJECT VEHICLE." (*See* Docket No. 288-2 ¶ 22).

Like defense counsel's factual basis when describing the triggering conditions of the anticipatory search warrant, there is nothing in the *Motion to Suppress* corroborating Defendants' version of events about how the traffic stop occurred. Over two months later, in the *Motion to File Video Exhibits*, Defendants provide three videos that depict law enforcement engagement with the Porsche Cayenne on February 5, 2021.

First, at the end of Video Exhibit 1, the Porsche is seen backing out of the SUBJECT PREMISES' driveway into the road, when it is stopped by agents. (*See* Video Exhibit 1 at 14:07-14:11). The video shows a flash and smoke at 14:20 by the driver's side door, and then any further view of the scene is obstructed by other vehicles in between the camera and the Porsche.

In "3 Vehicle Seized" ("Video Exhibit 2"), the Porsche appears to have been moved out of the middle of the road and is parked by the curb of the SUBJECT PREMISES with the front driver side door open. The video begins at the front, left-hand side of the Porsche, showing the open driver's door. (*See* Video Exhibit 2 at 0:00-0:04). The agent holding the camera then enters the open driver's door to film the front interior portion of the vehicle – the two front seats, center console, the driver side floorboard, part of

the passenger floorboard and doorframe pocket, and the dashboard are visible. Id. at 0:04-0:21. The video zooms in on a paper on the passenger side dashboard[16] and then skims left to show the vehicle's odometer. Id. at 0:08-0:21.

The agent then walks around the exterior of the car, circling towards the back of the Porsche and then up the passenger side to the front hood. Id. at 0:21-0:43. When filming the rear of the car, the shots of the back of the vehicle remain low and focus in on the license plate, "IMC-134," but do not provide a clear shot of the trunk window. Id. at 0:24-0:28. At 0:30 there is a view of the back right corner, showing both part of the trunk window and down the passenger side, but the reflection of the glass makes it unclear what is visible inside to the eye versus a camera. The video ends by circling forward to the front right corner of the vehicle exterior. Id. at 0:30-0:43. As the video scans the right side of the car, another agent is visible, now seated in the driver seat of the Porsche. Id. at 0:33-0:38. The video does not provide any images inside the back interior portion of the vehicle or inside the trunk.

---

[16] The document is a receipt prepared for "Sindybell Cruz Valentin" at URB PASEOS REALES CALLE in SAN ANTONIO, PR, in relation to "Patient: Charlin Ruiz Cruz" on a letterhead from "LECM ORTHO GROUP, LLC." (See Video Exhibit 2 at 0:08-0:12).

Defendants contend that Video Exhibit 2 captures the search of the Porsche, undercutting the "Government's claim that the package was in plain view and lawfully seized." (Docket No. 313 at 2). The video evidence presented does not show into the rear of the car where the package is allegedly placed; Video Exhibit 2 solely shows the front interior of the vehicle. However, this absence of footage showing the package does not mean the video evidence contradicts Government testimony.

Additionally, Video Exhibit 2 depicts an odometer reading, license plate view, and exterior shots of the car in a manner consistent with routine documenting of a vehicle for impoundment and inventory. While a seizure of property by police officers ordinarily requires a warrant, exceptions exist – such as for items in plain view. United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010). The pertinent question is "whether, on an objective view of the record, the impoundment (a form of seizure) was premised on evidence lawfully discovered and seized while in plain view." Id.; see United States v. Hadfield, 918 F.2d 987, 993 (1st Cir. 1990).

In United States v. Sanchez, law enforcement executed a search warrant related to a domestic violence charge on a defendant and then proceeded to impound the defendant's motorcycle on different grounds. 612 F.3d at 2-3, 5-6. Officers determined the motorcycle's license plate was "bogus" after running the information through

the state database – providing probable cause for a crime under
state law. Id. At the time of impounding the motorcycle, the police
officers were in a parking lot "where they had the right to be,"
and both the seized motorcycle and its bogus license plate were
"easily visible to the naked eye." 612 F.3d at 5. Thus, the
officers were lawfully in a position from which they saw the
objects they subsequently seized. Id.

In the present case, law enforcement officers were in a public
street and had stopped the Porsche Cayenne pursuant to sufficient
probable cause, as noted above. Accordingly, they were in a space
where they had a right to be when they saw the controlled delivery
package and seized the vehicle. While the video evidence does not
provide a clear angle into the Porsche, that does not mean the
parcel was not "easily visible to the naked eye" or that the video
evidence contradicts the Government's affidavit stating the
package was in plain view. See id. The "seizing officers'
conclusion, taking into account the totality of the circumstances,
need not be certain, but it must be based on no less than a 'fair
probability.'" Sanchez, 612 F.3d at 5 (quoting United States v.
Sokolow, 490 U.S. 1, 7 (1989)).

Furthermore, the Court in Sanchez highlighted that the
question is "whether probable cause existed for the seizure, not
whether probable cause existed for the arrest." Id. In Sanchez,

the objects seized were not evidence of the crime for which the
defendant was arrested. Id. The question was whether officers had
probable cause to believe the seized objects were evidence of some
other crime. Paralleling this to the present case, it is immaterial
whether Defendant Ruiz was arrested in that moment for the crime
charged in the subsequent *Indictment*. What was relevant for the
seizure of the Porsche Cayenne was whether law enforcement had
probable cause to believe the seized objects were evidence of a
crime – the drug trafficking for which the Anticipatory Warrant
was premised. The answer is yes. Thus, probable cause existed for
the seizure and impoundment of the vehicle, including the package,
when law enforcement saw the controlled delivery package in plain
view.

In "3 2021-02-05 Video_Surveillance" ("Video Exhibit 3"), the
footage consists of an aerial view over the SUBJECT PREMISES, with
the relevant interaction between law enforcement and the Porsche
Cayenne starting roughly twenty-seven minutes into the video.[17] At

---

[17] The first portion of the video is aerial surveillance over the SUBJECT
PREMISES and nearby streets, focusing in to show a black Jeep in the driveway.
(See Video Exhibit 3 at 0:00-5:58). At 5:59, a man (Ruiz) walks from the premises
to the black Jeep and opens the front passenger door, spends some time leaning
into the vehicle, before shutting the door and walking back into the garage.
Id. at 5:59-6:30. At 8:56, the same man (Ruiz) walks out of the garage, opens
the driver door to the black Jeep, and gets in. Id. at 8:56-8:59. The black
Jeep backs out of the driveway and drives off. Id. at 9:11. The aerial
surveillance follows the black Jeep as it travels through the town for about
six and a half minutes before parking outside of a house. Id. at 9:11-15:32.
Aerial surveillance continues above the Jeep and surrounding area for several
minutes. Id. at 15:32-18:36. At 18:36, Ruiz is seen exiting the building and

timestamp 27:21, the Porsche starts backing out of the garage and into the street. (*See* Video Exhibit 3 at 27:21-27:57. As the vehicle enters the road, law enforcement agents come running onto the screen towards the vehicle. Id. at 27:57. The Porsche stops in the road. Id. at 28:00. A flash and smoke grenade goes off near the driver's door as law enforcement surround the vehicle. Id. at 28:03.

At 28:08, law enforcement opens the driver door and, as a man (Ruiz) step his leg out, an agent pulls him fully from the vehicle and puts him on the ground, laying on his stomach. Id. at 28:08-28:14. While two agents secure Ruiz with restraints, two agents check the Porsche. As one agent stands by the driver door, the other agent opens the rear left door to check inside. Id. at 28:27-28:30. Then the agent moves around the back of the Porsche to the rear right door, opening and checking inside from that angle as well. Id. at 28:35-28:40.[18]

---

walking back to the car. He gets into the Jeep, backs out, and drives back to the SUBJECT PREMISES. Id. at 18:36-26:18.

Ruiz parks the black Jeep on the curb in front of the SUBJECT PREMISES, then gets out and walks into the garage and out of sight. Id. at 26:18-26:40. Not long after, the Porsche starts backing out of the garage and into the street. Id. at 27:21-27:57.

[18] The aerial surveillance camera pans away while the agent is looking in the door, and by the time the camera pans back at 28:47, the agent is walking back around the car.

At 30:18, agents help Ruiz off the ground and place him standing up against the back left edge of the Porsche. Id. at 30:18-30:24. Ruiz remains standing there until the end of the video, and no one does anything further near or in the vehicle. Id. at 30:24-32:31. There is no clear view into the full interior of the vehicle, but at different points a piece of paper is visible on the passenger dashboard, a few items sit on the right rear floorboard, and there appear to be objects in the trunk – including a box resembling the controlled delivery package. See id. at 28:37-32:31.

Defendants contend that Video Exhibit 3 demonstrates the unreasonable and excessive force used on the Porsche when agents launched a stun grenade. (Docket No. 313 at 2). They also assert that the video "challenges the credibility of the Government's affidavit statements relating to the circumstances of the stop, the safety justifications offered for the search, and the surrounding exigency claims." Id.

Again, the video evidence's failure to clearly depict the controlled delivery package does not equate to contradicting the Government affidavit stating the package was in plain view. Moreover, Defendants do not deny that the package was in the vehicle. Based on agents' description of events and law enforcement's awareness that the package from the controlled

delivery was in the vehicle, there was probable cause to stop the Porsche. Observing the package in plain view in the rear of the vehicle provided probable cause to seize the vehicle, since law enforcement had a right to access the object of the controlled delivery. Furthermore, while the videos do depict law enforcement's engagement with the Porsche in greater detail, they do not ever show agents seizing and removing the package from the vehicle as Defendants allege in the *Motion to Suppress*.

>   *iii.  Defendant failed to make the substantial showing required for a <u>Franks</u> hearing regarding the Porsche Warrant*

First, the Court rejects Defendants' arguments that law enforcement failed to meet its triggering condition prior to exercising the Anticipatory Warrant on February 5, 2021. (*See* Docket No. 271 at 40). Accordingly, that assertion of a misrepresentation by Defendants has no traction.

In addition to the general allegations of how the warrant affidavits misrepresented and omitted facts to reach probable cause (*see discussion under Anticipatory Warrant)*, Defendants have additional concerns regarding the February 8 Porsche Warrant. They contend the affidavit "deliberately omitted" that officers conducted a "full search" of the Porsche Cayenne during the traffic stop, "seizing the unopened package along with other items from the vehicle" – all without probable cause. (Docket Nos. 271 at 13-

14, 39-40 and 295 at 14-23). Defendants argue this makes it appear as if law enforcement requested the warrant before any search occurred, "when in fact, it was an attempt to retroactively justify an illegal search." Id. Further, Defendants maintain that this reckless omission, had it been considered, would vitiate probable cause. Id.

However, defense counsel provides no sworn affidavit to corroborate this story of a full search and removal of the package and other items from the Porsche, and the video exhibits provided two months later do not depict the removal of any items from the car. Therefore, Defendants cannot rely on the video evidence to call into question the Government's assertion that the package was not removed from the car until the February 8 Warrant.

The affidavit in support of the Porsche Warrant states that as Ruiz "was exiting the garage driveway area, while driving the SUBEJCT VEHICLE, he was intercepted by HIS agents. The PACKAGE was observed in plain view in the rear of the SUBJECT VEHICLE." (Docket No. 288-2 ¶ 22). Accordingly, the Porsche Warrant sought "authority to enter the SUBJECT VEHICLE and search for" items described in Attachment B to the Porsche Warrant. Id. ¶ 24. This notably includes the package from the controlled delivery, presumably still inside the seized vehicle as the Government attests. Id. at

12. Defendants fail to provide a sufficient offer of proof to contradict the Government's sworn account of events.

As to other alleged material misrepresentations and omissions, Defendants allege that the affidavit omitted "critical exculpatory information": (1) that Ruiz placed the package in the vehicle to return it to the post office, not conceal or distribute its contents; (2) the fact that the package had not been tampered with or opened, "contradicting any claim that [Ruiz] knowingly possessed contraband"; and (3) the fact that law enforcement had already searched the residence and "found no additional evidence of drug trafficking activity." (Docket No. 271 at 27). <u>First</u>, Defendants' contention is a self-serving statement of intent that is not corroborated. <u>Second</u>, while the affidavit does not specifically state that the package was not tampered with or opened, it does tell a narrative where Cruz took the package inside and then Ruiz later placed the package in the subject vehicle. (Docket No. 288 ¶ 22). There is no implication the package was opened, nor did the Government assert such facts to mislead a magistrate. Defendants' argument that this information contradicts the idea that Ruiz "knowingly possessed contraband" is merely a suggestive statement. <u>Third</u>, the affidavit directly contradicts Defendants' contention that no additional evidence of drug trafficking was found at the residence. The affidavit explicitly

Criminal No. 22-232 (RAM)                                             52

states that $500,000, marijuana plants, pills (possibly containing fentanyl), various electronic devices, a bill-counting machine with a monitor, a United States passport, cash labels, two U.S.P.S. receipts, CBP documents, a digital pocket scale, and one plastic wrapping roll were recovered from the SUBJECT PREMISES. (Docket No. 288-2 ¶ 23).

> iv. *Sufficient probable cause existed for the issuance of the February 8 Warrant of the Porsche Cayenne*

The probable cause laid out for the Anticipatory Warrant is applicable here. In addition to that, the affidavit included details regarding the controlled delivery of the package on February 5, 2021, to the SUBJECT PREMISES – including the property seized. (Docket No. 288-2 ¶¶ 21-23). "After accepting the PACKAGE, [Cruz] took the PACKAGE inside the residence," until Ruiz later arrived and placed it inside the Porsche Cayenne. Id. ¶ 22. As Ruiz exited the garage driveway area driving the Porsche Cayenne, HSI agents intercepted him and observed the package in plain view in the rear of the car. Id. This is sufficient probable cause for the seizure of the Porsche Cayenne and the issuing of the February 8 Warrant.

## C. Forensic Analysis on the Seized Electronic Devices was Pursuant to a Valid Warrant Issued on February 23

> i. *Defendants have sufficient standing to challenge the seizure and search of their electronic devices*

While the Government concedes Defendants have standing to challenge the initial seizure of their electronic devices from the subject premises on February 5, 2021, the Government contests Defendants' standing to legally challenge the forensic search of those devices. (Docket No. 288 at 10). The Government argues that Defendants have not established an expectation of privacy as to the contents of each individual device since they do not identify which devices belong to them and only argue they contain "highly personal and sensitive data." Id. Moreover, in the *Sur-Reply*, the Government highlights that the Apple iPhone XR was seized from a third co-defendant at a separate location, and Defendants have provided nothing suggesting they have a privacy interest in that device. (Docket No. 303 at 2).

In the *Motion to Suppress*, Defendants allege they have standing to challenge the "illegal search and forensic analysis of their electronic devices, which contained highly personal and sensitive data," because "law enforcement conducted a forensic analysis of the seized electronic devices before obtaining a valid warrant" as required by the Fourth Amendment. (Docket No. 271 at 23-24). Accordingly, Defendants contend that since their Fourth Amendment rights were violated by the alleged warrantless search, they have standing. Id. at 24 (citing Riley v. California, 573 U.S. 373 (2014), in support of their assertions that cell phones

and digital devices contain vast amounts of personal data and thus require heightened protections and a warrant prior to being searched).

The Court finds Defendants have a sufficiently substantial privacy interest in the devices seized from their residence to establish standing. However, they lack standing to challenge the forensic analysis of co-defendant Ivelisse Alvarez-Sepulveda's cell phone since she voluntarily released it to law enforcement at a different location and it was not seized from Defendants' residence. (*See* Docket No. 288-3 ¶ 9).

> ii. *Defendants failed to make the substantial showing required for a* <u>Franks</u> *hearing regarding the Electronic Devices Warrants*

As a threshold matter, the Court rejects Defendants' arguments that law enforcement failed to meet its triggering condition prior to exercising the Anticipatory Warrant on February 5, 2021. Accordingly, that assertion of a misrepresentation by Defendants has no traction.

In addition to the general allegations of how the warrant affidavits misrepresented and omitted facts to reach probable cause (*see discussion under Anticipatory Warrant*), Defendants have additional concerns regarding the February 23 warrants for the electronic devices. Mainly, they argue the affidavits suggested there was probable cause to believe the devices contained evidence

of drug trafficking activities, but "failed to disclose" law enforcement had already conducted forensic searches of the devices before obtaining a warrant. (Docket No. 271 at 40). Defendants contend that omitting this Fourth Amendment violation "deprived the magistrate judge of critical information that would have undermined any finding of probable cause." Id. at 40-41. Defendants also argue that the lack of properly documented forensic procedures further complicates any evidentiary chain of custody and its admissibility in court. Id. at 14

In their *Reply*, Defendants elaborate further upon this contention that forensic analysis was conducted without immediate judicial authorization, claiming that six devices show signs of forensic extraction between February 17 and 22. (Docket No. 295 at 24-25). However, defense counsel's factual basis for such an assertion is unclear since no evidence, corroborating report, or affidavit is provided in support. Defendants also argue that the Government refused to provide forensic reports, has ignored its duty to disclose exculpatory evidence, and falsely claimed that forensic extractions only occurred after the issuance of search warrants. Id. at 26-27. Defendants' speculative theory appears to be an attempt at a discovery expedition instead of a proper Franks challenge grounded in corroborated fact.

Looking specifically to HSI reports provided by Defendants in their appendices, there is no indication that the Government proceeded with any forensic analysis prior to proper judicial authorization. (*See* Docket No. 274 at 188-221).[19] Furthermore, the report for the execution of the search warrants on the electronic devices mentions that the devices were turned over for forensic analysis on February 24, 2021, and March 1, 2021. (Docket No. 274 at 190).

As to the individual devices Defendants claim were forensically analyzed prematurely, reports were included in the appendices for only two of the devices allegedly reviewed without authorization.[20] First, the Samsung Cellular Phone (Burgundy Cover). (*See* Docket Nos. 274 at 193-200 and 295 at 24). Defense counsel claims the device was forensically analyzed on February 20, 2021, yet there is no report, evidence, or sworn statement provided to corroborate this assertion, nor is that date mentioned

---

[19] This includes a report on the Execution of Search Warrants of Electronic Devices Seized on February 5, 2021, as well as forensic analysis reports on: the 008 Samsung Cellular Phone with Burgundy Cover, the 019 Night Owl DVR Recorder, the Apple I Phone XR and SIM card obtained from Ivelisse ALVAREZ-Sepulveda, and the LG Cellular Phone with Gray Cover and White Apple Sticker.

[20] Defense counsel provided the report for the Night Owl Recorder but made no claim as to when it was forensically searched. (See Docket No. 274 at 201-04). The report mentioned that a federal search warrant was obtained on February 23, 2021, to extract data from the device. Id. at 202. Defense counsel also provided the report for the LG Cellular Phone with Gray Cover and White Apple Sticker but made no claim as to when it was forensically searched either. (See Docket No. 274 at 212-221).

in the appendix report. Id. Second, the Apple iPhone XR (Black,
Serial DX3YJ5L6KXKN).[21] (See Docket Nos. 274 at 205-11 and 295 at
24). Defense counsel claims the device was forensically analyzed
on February 19, 2021, yet there is no citation provided to
corroborate this assertion, nor is that date mentioned in the
appendix report. Id. The report instead states that a search
warrant (21-274(M)) was granted on February 23, 2021, and that on
February 24, 2021, an HSI forensic agent received the device to
initiate analysis. (Docket No. 274 at 206). As to the LG Cellular
Phone (Black Cover); Thumb Drive (Red and Black, 32GB; Apple iPad
(A1432, Gray); and Apple MacBook (A1278), defense counsel asserts
that they were all forensically analyzed prior to the issuance of
the electronic devices search warrants, yet he provides no citation
to corroborate this claim or any evidence of how that information
would have been obtained. (Docket No. 295 at 25).

     In terms of proof needed to make a substantial preliminary
showing for a Franks hearing, the Supreme Court requires
"[a]ffidavits or sworn or otherwise reliable statements of
witnesses." Franks, 438 U.S. at 171. If no such affirmative
evidence is presented, its "absence should be explained." Id.
Defendants fail to provide even a singular citation for these

---

[21] The Court notes that this device was seized from Ivelisse Alvarez-Sepulveda
at a separate location from the SUBJECT PREMISES. (See Docket No. 288-3 ¶ 9).

assertions, let alone submit an offer of proof. *See* id. While Defendants attempt to shift blame to the Government as to why proof, such as extraction data, is absent and unavailable to them, their claims are based on what appears to be reports the Government **did** produce during discovery.

The Government notes in its *Sur-Reply* that upon contacting Defendants on March 24, 2025, with a request to identify the source of the dates underlying their assertions, Defendants sent "selected portions of two electronic devices' forensic reports." (Docket No. 298 at 2). **Neither of these documents were attached or cited by Defendants to the Court** in their *Motion to Suppress* or *Reply*.[22] The Government highlights that none of the documents referenced by Defendants contain the specific dates they cite in their *Reply*. Id. Instead, the partial forensics reports for two devices Defendants provided state extractions started on June 24, 2021. Id.

The Government further emphasizes that various datapoints have been highlighted in the reports by a person it believes to be an employee of defense counsel. Id. **However, (1) no one submitted a declaration or affidavit specifying the qualifications of said**

---

[22] According to the Government (*see* Docket No. 303 at 2), these documents are attached to Defendants' *Motion to Compel* (*see* Docket Nos. 299-1, 299-2, and 299-3).

**employee to render opinions on the data, and (2) no information was proffered regarding what methods were used to pinpoint the dates specified in Defendants'** *Reply* **of forensic analysis.** Id. Moreover, the Government avers that nothing in those documents states the electronic devices were opened and searched on the dates Defendants allege. Id.

After the *Motion to Suppress* was fully briefed, Defendants filed their *Motion to Compel* with an argument that mirrored its contentions regarding the premature search of the electronic devices and appending the documents the Government references in its *Sur-Reply*.[23] (Docket No. 299). The Court denied the *Motion to Compel* on April 14, 2025, as well as Defendants' *Motion for Reconsideration*. (Docket Nos. 305 and 326). Of note, **the arguments in the** *Motion to Compel* **regarding the time at which the Government began an illegal warrantless forensic analysis of the devices do not match the alleged timing of searches as put forth in the** *Motion to Suppress,* **specifically the** *Reply*. Id. at 2-6; *compare with* Docket No. 295.[24]

_____

[23] The Court shares the Government's concerns expressed in its *Sur-Reply* regarding the exhibits: **(1) no information was proffered regarding what methods were used to pinpoint the dates specified in Defendants'** *Motion to Compel* **and (2) no one submitted a declaration or affidavit specifying the qualifications of the individual who rendered such differing opinions on the CELLEBRITE data.** (*See* Docket No. 305).

[24] The Reply states that warrantless forensic extractions began on February 17 through February 22 on six identified devices (see Docket No. 295 at 24-25), while the Motion to Compel states that the CELLEBRITE reports show that

In the *Motion to Suppress*, Defendants also assert the affidavit supporting the warrant contained insufficient and misleading statements, such as: (1) an assertion that Cruz and Ruiz used electronic devices to facilitate drug transactions, without providing evidence to support such a claim; (2) an irrelevant claim that prior narcotics investigations uncovered evidence of drug trafficking on electronic devices, since there was no direct link to Defendants' specific devices; and (3) an "omission of the fact that no narcotics, distribution materials, or financial records were found during the unlawful searches of the residence and vehicle." Id. at 28.

Defendants' contention of misleading statements in the affidavit misses the mark. The search of the SUBJECT PREMISES resulted in the seizure of cash, controlled substances, electronics, and other documents or items (*see* Docket No. 288-3 ¶ 21) that refute Defendants' contention that "no narcotics, distribution materials, or financial records were found." (Docket No. 271 at 28). Furthermore, based upon Agent González's training and experience, he credibly stated in the warrant affidavit that "people who illegally possess firearms and controlled substances in concert with other individuals commonly maintain records" of

extraction began on February 5 and continued through February 9 for two of the devices (see Docket No. 299 at 2-5).

their communications and photographs on their cellular phones. (Docket No. 288-3 ¶ 6).

### iii. Sufficient probable cause existed for the issuance of the February 23 Electronic Devices Warrants

Defendants assert that the Electronic Devices Warrants were facially defective because they lacked specific facts demonstrating a nexus between Defendants' electronic devices and the alleged criminal activity. (Docket No. 271 at 27-29). Additionally, they state that their issuance was based on insufficient and misleading information. Id. As the Government points out, the affidavit supporting the warrants "established layers of probable cause" that the seized electronic devices contained evidence of drug trafficking. (Docket No. 288 at 17-19).

First, the probable cause established for the Anticipatory Warrant applies here. The Anticipatory Warrant indicated that law enforcement was to seize records, books, receipts, ledgers, notes, and electronic data relating to the purchase and distribution of controlled substances. (Docket No. 288-1 at ¶ 1). Specifically, property to be seized encapsulated "[e]lectronic devices including but not limited to cellphones, computers, and any other mobile and non-mobile electronic device that may be used to store pictures and/or communications." Id. ¶ 2.

Second, as addressed above, Defendants' contention of misleading statements in the affidavit misses the mark. Specifically, the search of the residence resulted in the seizure of roughly $500,000, marijuana plants, pills (possibly fentanyl), various electronic devices, a bill counting machine with monitor, a United States passport, cash labels, two U.S.P.S. receipts, CBP documents, a digital pocket scale, and one plastic wrapping roll. (Docket Nos. 288-3 ¶ 21). Furthermore, the Court evaluates "whether, given all the circumstances set forth in the affidavit . . . there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 462 U.S. at 238. "[C]ommon sense says that a connection with the search site can be deduced 'from the type of crime, the nature of the items sought,' plus 'normal inferences as to where a criminal would hide' evidence of his crime." Rivera, 825 F.3d at 63 (quoting United States v. Felix, 182 F.3d 82, 88 (1st Cir. 1999)). There exists sufficient probable cause to believe the seized electronic devices contained evidence of the drug trafficking crimes.

Defendants also contend that there was no justification for the Government's delaying of the warrant application for almost three weeks since law enforcement had "full control" over the electronic devices from February 5, 2021, onward. (Docket No. 271 at 36, 47). They point to a Ninth Circuit case for the premise

that "unreasonable delays in obtaining a search warrant for digital
devices can violate the Fourth Amendment, particularly when there
is no immediate threat of evidence destruction." Id. The Government
rebuts this argument, arguing Defendants' caselaw may be
applicable if there is an unreasonable delay in obtaining a search
warrant for devices seized with something less than a search
warrant, which is not the case here. (Docket No. 288 at 20-21).

The Government correctly notes that the electronic devices
were seized pursuant to a valid search and seizure warrant and
that federal agents only took fifteen working days to obtain
specific forensic search warrants for each device. Id. at 21.
Accordingly, the Court finds no unreasonable delay or
constitutional violation occurred.

## V.    CONCLUSION

Accordingly, the Court **DENIES** Defendants' *Motion to Suppress*
at Docket No. 271 as to the items seized from the SUBJECT PREMISES
and the items seized from the Porsche Cayenne. As to the electronic
devices seized from Defendants' home, the Court denies the motion
without prejudice in light of ongoing discovery.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 13th day of May 2025.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE